# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **HILDA BROWN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action No.:** |
| **v.** ) | |
| ) | |
| **KEYSTONE FOODS, LLC, EQUITY** ) | **JURY DEMAND** |
| **GROUP EUFAULA DIVISION, LLC, AND** ) | |
| **TYSON FOODS, INC.** ) | |
| ) | |
| **Defendant.** ) | |

## COMPLAINT

**I.   JURISDICTION**

1.   Plaintiff invokes jurisdiction under the Act of Congress known as Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, and 42 U.S.C. §2000e. The Court has jurisdiction of the subject of this action according to 28 U.S.C. §§1331, 1343(a) (4), 2201 & 2202. This suit also asserts state law claims of outrage, and negligent retention and under Alabama law.

2.   Plaintiff timely filed her charge of sex discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC) within 180 days after the last discriminatory treatment. Plaintiff further filed her sex discrimination and retaliation suit within 90 days after receipt of her right-to-sue letter issued from the EEOC.

**II.   PARTIES**

3.   Plaintiff, Hilda Brown, is a female citizen of the United States and a resident of the State of Alabama. Defendants employed Plaintiff at their Bakerhill, Alabama location at all times relevant to this lawsuit.

4.   Defendant Keystone Foods, LLC, hereafter "Keystone Foods", is subject to suit

1

under 42 U.S.C. §2000e, the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991.

5. Defendant Equity Group Eufaula Division, LLC, hereafter "Equity Group", is subject to suit under 42 U.S.C. §2000e, the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991.

6. Defendant Tyson Foods, Inc., hereafter, "Tyson" is subject to suit under 42 U.S.C. §2000e, the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991.

## I. STATEMENT OF FACTS

7. Plaintiff adopts and re-alleges Paragraphs 1-6 above as if fully set forth in full herein.

8. Plaintiff is a female.

9. Plaintiff worked for Defendants as a driver from approximately September 28, 2018 until her termination on November 27, 2018.

10. During Plaintiff's initial interview, manager Carldon Grant, ("Grant"), told Plaintiff she would be unable to wear lipstick, makeup, or have her hair styled, i.e., Plaintiff's appearance was too "feminine."

11. Grant represented to Plaintiff he was not hiring for the posted driving position for several months.

12. Grant told Plaintiff she could work immediately if a female at the plant could find her a position until a driving position became available.

13. A human resources representative of the Defendants was present in this initial meeting and overheard these comments.

14. Grant told Plaintiff she was assigned to work in shipping.

15. The night before Plaintiff's first shift began, Grant told Plaintiff she was to be a

driver.

16. Grant instructed Plaintiff to observe Lee Denson drive, but then had Plaintiff drive on her first shift.

17. The Defendants' decision to have Plaintiff immediately drive contrasts with Defendants' policies and regular practices, which mandate Plaintiff observe another driver before assuming the job duties.

18. Plaintiff asked Grant if she could haul different loads and change shifts on multiple occasions.

19. Grant told Plaintiff changing loads or shifts was not a possibility, despite male drivers being given the freedom to change loads and/or shifts.

20. During Plaintiff's first week of employment, she heard Lagarrett Dinkins, ("Dinkins"), wanted to personally train Plaintiff.

21. Plaintiff heard of sexually explicit comments concerning Plaintiff and made by male co-workers, including but not limited to Jevonne Richardson, ("Richardson"), and Dinkins.

22. Anthony Mitchell informed Plaintiff that Grant was fearful of Plaintiff being on his shift because of the discriminatory culture perpetuated by his male drivers, and the possibility of Plaintiff complaining to the Defendants' Human Resources department.

23. Male drivers routinely and purposefully abandoned Plaintiff at Defendants' facility without giving her directions to her destination.

24. Plaintiff asked Grant for directions, but Grant asked the Plaintiff to "get with the guys and try to find [her] way."

25. Plaintiff asked Charlie (LNU), a manager, for directions, but Charlie was unable to provide Plaintiff with the same.

26. Dinkins offered Plaintiff a ride after Plaintiff was abandoned by her male co-workers, although Plaintiff was unaware of Dinkins' identity at the time.

27. Dinkins then informed male co-workers he did not want to help Plaintiff in the future.

28. In or around October 2018, Richardson stated he would have sex with Plaintiff if Dinkins did not.

29. Plaintiff's conversations with male co-workers began to be cut short by Dinkins.

30. Dinkins made comments such as, "You're cock blocking me," "That's my woman," and " Fuck that bitch," to male co-workers.

31. Dinkins made such a statement to Jimmy Cochran, who wrote and submitted a statement about about their interaction.

32. Anthony Mitchell told Dinkins' wife many men at the Defendants' facility, including Dinkins, were competing Plaintiff's attention.

33. Grant led a meeting with his team on or around October 31, 2018, but failed to address Plaintiff's being abandoned and ridiculed directly.

34. Dinkins instead told the other drivers to "[m]ake sure that everyone makes it to the farm."

35. During this meeting, Grant told everyone present there was a "Woman's position opening at the feed mill because [Plaintiff] had turned it down."

36. Anthony Mitchell told Plaintiff that she could make a lot of money if she accepted the position Grant had deemed as one for a female, and offered to train her.

37. Defendants never confronted or disciplined Plaintiff's co-workers for making these comments.

38. Plaintiff's male co-workers defied Grant's orders given at the meeting, again abandoning Plaintiff without directions to their destination.

39. Plaintiff heard the male drivers openly mocking Plaintiff on the radio, including but not limited to statements such as "looks like the bird flew the coop," a veiled reference to Plaintiff.

40. The male drivers spoke openly about defying Grant's explicit orders.

41. Plaintiff once pulled her truck onto the shoulder, prompting Dave (LNU), one of the male drivers who left Plaintiff at the plant, to drive by and examine Plaintiff, only to drive away before Plaintiff could follow Dave to the assigned destination.

42. Plaintiff made use of the radio to inform her co-workers she was returning to the plant to speak with Grant about their discriminatory behavior.

43. Plaintiff met Grant met Plaintiff at the plant where Plaintiff told Grant how the other drivers had defied his orders.

44. Grant again told Plaintiff the Defendants did not have directions and requested she follow the male drivers to their destination.

45. Plaintiff informed Grant about a statement from Lewis Williamson, a Farm Supervisor, who told Plaintiff she was a good driver, and he was sympathetic to Plaintiff for her having to endure her co-workers' discriminatory behavior.

46. Sammy Nelson told Plaintiff he was aware of the discriminatory actions taking place and advised Plaintiff to visit Defendants' human resources department that day.

47. Plaintiff then called Lewis Williamson and told him she was going to complain to the Defendants' Human Resources department.

48. Lewis Williamson expressed satisfaction with Plaintiff's decision to complain, and stated the discriminatory treatment needed to stop.

49. Plaintiff also called Bo (LNU), a male driver, and told him she could not endure further discriminatory behavior and was therefore going to complain to the Defendants' human resources department.

50. Bo then told Grant Plaintiff was going to complain to the Defendants' human resources department.

51. In response, Grant instructed Bo to order Plaintiff to wait on Grant's input before going to the Human Resources department.

52. Plaintiff waited on Grant before making her complaint, where Grant asked Plaintiff to refrain from complaining.

53. Plaintiff proceeded to complain to the Defendants' Human Resources department about all discriminatory behavior she encountered throughout her employment.

54. Grant accompanied Plaintiff to the office and was present during her complaint.

55. While speaking to Human Resources, Plaintiff experienced physical manifestations of stress associated with the discriminatory behavior she was routinely exposed to.

56. Robin Jones, ("Jones"), a Human Resources representative present for Plaintiff's complaint, promised to investigate the matter.

57. Grant told Plaintiff he did not know how to address Dinkins and Richardson's discriminatory behavior.

58. The discriminatory behavior worsened after Plaintiff's complaint. Male co-workers continued to abandon Plaintiff and make comments based on Plaintiff's sex.

59. On November 5, 2018, and because of the Defendants' inaction at the plant level, Plaintiff called the corporate complaint hotline and complained about the sex discrimination she was being forced to endure.

60. On or around November 9, 2018, Jones called Plaintiff to inform her that she needed to return to the human resources office to be apprised of the results of Jones' investigation.

61. Jones immediately mentioned Plaintiff's call to the Defendants' corporate complaint hotline when Plaintiff entered Jones' office.

62. Plaintiff was surprised because she was given the impression her call to the corporate complaint hotline was kept in confidence.

63. Grant was present at the meeting regarding the results of Defendants' investigation, where he told Plaintiff he was terminating Dinkins' employment.

64. Dinkins then stated he was retaining Richardson because Richardson possessed information regarding allegations of another employee stealing, and the Defendants needed information from him.

65. Jones and Grant told Plaintiff that Dinkins was disallowed from speaking to Plaintiff, nor could Plaintiff speak with Dinkins aside from official business matters.

66. Plaintiff was falsely accused of calling Dinkin's wife during this same meeting.

67. Plaintiff explained to Grant and Jones her telephonic records would reveal that Dinkins' wife had actually reached out to Plaintiff first.

68. Plaintiff was then demoted and transferred to a different shift.

69. Plaintiff later discovered she would be making less while performing the same job duties.

70. Jones and Grant promised Plaintiff they would strictly enforce the Defendants' policies regarding sex discrimination.

71. One evening after Plaintiff's transfer, Plaintiff clocked out and entered the plant to buy chicken with co-workers.

72. When Plaintiff entered the plant, she noticed Grant having a meeting with male drivers on her former shift.

73. By the time Plaintiff arrived at her home during the same evening, Plaintiff received a call from Lee Denson, who told Plaintiff that Grant informed others of Plaintiff's call the corporate hotline.

74. Grant told the male drivers on Plaintiff's former shift they would be disciplined if they ever spoke with Plaintiff again.

75. Plaintiff returned to the plant to again speak with Jones after hearing this information from Lee Denson.

76. Plaintiff challenged Jones on her promise to strictly enforce the Defendants' policies regarding sex discrimination.

77. Later that day, Plaintiff received a telephone call from Jones.

78. After a brief hold, Plaintiff was transferred to Grant's direct office telephone line where she was on speakerphone.

79. Plaintiff overheard Robin ask Grant about the meeting with male drivers from Plaintiff's former shift.

80. Grant explicitly denied organizing or taking part in any such meeting.

81. Plaintiff again began to experience physical manifestations of stress caused by the Defendants' discriminatory behavior.

82. Jones told Plaintiff, "Hilda! He said that he didn't do it! He didn't do it!".

83. In an attempt to identify and retaliate against anyone sympathizing with Plaintiff, Jones and Grant asked Plaintiff for the identity of any individual who told her about the meeting.

84. Grant began to account for each individual present at the meeting, asking Plaintiff

to identify the names of individuals whom gave Plaintiff information about the meeting.

85. Grant seemed to have a roll sheet for the meeting in front of him and spoke with an angry tone.

86. Jones or Grant abruptly terminated the call.

87. On or around November 10, 2018, Plaintiff's stress levels reached a point where she needed to see a physician due to the events described above and the Defendants' failure to remedy the sex discrimination or take her complaints of the same seriously.

88. Per Defendant's policies, Plaintiff called her farm supervisor, Bryan Sanders, and informed him of her medical situation.

89. On or around November 10, 2018, submitted her medical documentation.

90. Jones informed Plaintiff she would call Plaintiff on November 11, 2018, but Jones never made the call to Plaintiff as promised.

91. Plaintiff attempted to contact the Defendants' Human Resources department or the corporate complaint hotline multiple times, but the Defendants' ignored Plaintiffs' calls.

92. Plaintiff later became aware of a meeting where the Defendants' employees were told they should never answer another call from Plaintiff.

93. On one occasion, when Plaintiff called the Defendants, she received an answer.

94. Plaintiff believes the answering party to be Marie Thornton of the Defendants' Human Resources department. Marie Thornton quickly terminated the call.

95. Plaintiff received a text message from a supervisor asking Plaintiff to call Jones.

96. Plaintiff called Jones and when Jones answered, she informed Plaintiff her recent note from her doctor was under review.

97. Jones told Plaintiff she would inform Plaintiff when she could return to work.

98. Plaintiff did not hear from the Defendants for some time.

99. On November 27, 2018, the Defendants' terminated Plaintiff's employment.

100. Plaintiff was told her termination was due to missing work.

101. During the days in question, Plaintiff was awaiting a call from the Defendants to authorize her return to work per Jones' instructions.

102. Plaintiff was also advised against returning to work during these same days by a medical professional.

103. Shortly after Plaintiff's termination, she learned that both Richardson and Dinkins were terminated and banned from the Defendants' plant for sexual harassment and/or aggression towards another female before Plaintiff was hired

104. The Defendants' Human Resources department and management, including but not limited to Jones and Grant, were aware of this prior sex discrimination fact at all times relevant to this action. Despite such knowledge, they allowed employees to discriminate against Plaintiff because of her sex.

## II.   SEX DISCRIMINATION (DISPARATE TREATMENT)

105. Plaintiff adopts and re-alleges Paragraphs 1-6 and 8-104 above as if fully set forth herein.

106. Plaintiff was discriminated against because of her sex in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991.

107. Based on her gender, Plaintiff experienced disparate terms and conditions of employment compared to male employees.

## III.   SEX DISCRIMINATION (SEXUAL HARASSMENT)

108. Plaintiff adopts and re-alleges Paragraphs 1-6, and 8-104 as if fully set forth herein.

109. Plaintiff was discriminated against and harassed because of her sex in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991. Due to her sex, the plaintiff experienced harassment, and this harassment created a sexually hostile work environment.

110. The harassment was unwelcomed, was severe, and or pervasive, and it affected the terms and conditions of the plaintiff's employment.

111. Plaintiff complained of sexual harassment multiple times.

112. Because of the sexual harassment, Plaintiff's complaint of harassment, and Defendants' failure to appropriately handle the complaint of sexual harassment, Plaintiff was further harassed.

113. Defendant failed to take prompt remedial action to stop or remedy the harassment.

114. Because of Defendants' conduct, the plaintiff suffered severe emotional distress, embarrassment, and humiliation.

115. Defendants acted with malice, and or reckless indifference toward Plaintiff.

## IV.  **RETALIATION**

116. Plaintiff adopts and re-alleges Paragraphs 105 - 115 above as if fully set forth herein.

117. During Plaintiff's employment with Defendants, she was subjected to sex discrimination by male employees.

118. The Plaintiff continually complained to Defendants about unlawful sex discrimination.

119. Plaintiff was terminated shortly after her complaints regarding unlawful sex discrimination.

120. The proximity of Plaintiff's complaints and her termination show the causal connection between the two events.

121. Due to Defendants' retaliation, Plaintiff suffered lost wages, emotional distress, embarrassment, and humiliation.

## V. NEGLIGENT/WANTON RETENTION

122. Plaintiff adopts and re-alleges Paragraphs 1-6 and 8-104 above as if fully set forth herein.

123. Defendants acted with malice, and or reckless indifference towards Plaintiff.

124. By action or inaction, Defendants ratified, and or condoned unlawful sex discrimination directed at Plaintiff.

125. The Defendants knew or should have known of its male employees' discriminatory conduct taking place both before and during Plaintiff's employment, including but not limited to that of Lagarrett Dinkins, Jevonne Richardson, and Anthony Mitchell.

126. The Defendants failed to take adequate steps to remedy the situation.

127. The Defendants' failure to adequately remedy the situation caused the Plaintiff to suffer severe emotional distress, embarrassment, and humiliation.

## VI. OUTRAGE

128. Plaintiff adopts and re-alleges Paragraphs 1-6 and 8-104 above as if outlined in full herein.

129. The Defendants and their managers outrageously and intentionally inflicted emotional distress upon Plaintiff by knowingly allowing her to experience unlawful sex discrimination and retaliation.

130. The Defendants outrageously and intentionally inflicted emotional distress upon

the Plaintiff by ratifying the illegal actions of its employees including but not limited to Lagarrett Dinkins, Jevonne Richardson, Anthony Mitchell, Robin Jones, and Marie Thornton.

131. Defendants ratified the unlawful discrminatory conduct of its employees where it knew about their conduct, or should have known such conduct constituted unlawful sex discrimination and was outrageous, and failed to take adequate steps to remedy the situation.

132. Management's response or lack thereof to the Plaintiff's complaints, also outrageously and intentionally inflicted emotional distress upon the Plaintiff.

133. Defendant acted with malice, and or reckless indifference toward the Plaintiff.

134. Due to such conduct, the Plaintiff suffered severe emotional distress, embarrassment, and humiliation.

## VII. **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully prays that this Court assume jurisdiction of this action and after trial:

a. Issue a declaratory judgment that the policies, practices, procedures, conditions, and customs of the defendant violate the rights of the plaintiff as secured by 42 U.S.C. §2000e, the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, and the pendent state law claims in this action.

b. Grant Plaintiff a permanent injunction enjoining Defendants, their agents, successors, employees, attorneys and those acting in concert with Defendants and at the Defendants' request from continuing to violate 42 U.S.C. §2000e, the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991.

c. Enter an order requiring the Defendant to make the plaintiff whole by awarding her reinstatement, back-pay (plus interest), front-pay, compensatory damages, punitive damages, and

or nominal damages.

      d.     Plaintiff further prays for such other relief and benefits as the cause of justice may require, including, but not limited to, an award of attorneys' fees, costs, and expenses.

                                                                        Respectfully submitted,

                                                                         /s/ Eric Sheffer
                                                                         Eric Sheffer
                                                                         **Counsel for Plaintiff**

**OF COUNSEL:**
**WIGGINS CHILDS PANTAZIS**
**FISHER & GOLDFARB, LLC**
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
Telephone: (205) 314-0500
Facsimile: (205) 254-1500
E-mail: Esheffer@wigginschilds.com

                                         **PLAINTIFF DEMANDS TRIAL BY STRUCK JURY**

                                                                        /s/ Eric Sheffer
                                                                         Eric Sheffer
                                                                         **OF COUNSEL**

**SERVE DEFENDANT BY CERTIFIED MAIL AT:**
**Keystone Foods, LLC**
**c/o  C T Corporation System, Registered Agent**
**2 North Jackson Street., Suite 605**
**Montgomery, Alabama 36104**

**Equity Group Eufaula Division, LLC**
**2 North Jackson Street., Suite 605**
**Montgomery, Alabama 36104**

**Tyson Foods, LLC**
**2 North Jackson Street., Suite 605**
**Montgomery, Alabama 36104**